DISTRICT OF OREGON
**F I L E D**
April 09, 2020
**Clerk, U.S. Bankruptcy Court**

Below is an opinion of the court.

_____
DAVID W. HERCHER
U.S. Bankruptcy Judge

UNITED STATES BANKRUPTCY COURT

FOR THE DISTRICT OF OREGON

| | |
|---|---|
| In re **Luis Alberto Chavez-Villasenor** and **Yadira Reyes-Falcon**, Debtors. | Case No. 18-33538-dwh13 |
| **Luis Alberto Chavez-Villasenor** and **Yadira Reyes-Falcon**, Plaintiff, v. **U.S. Department of Education**, Defendant. | Adversary Proceeding No. 19-03046-dwh MEMORANDUM DECISION NOT FOR PUBLICATION |

**I.     Introduction**

Debtors, Luis Alberto Chavez-Villasenor and Yadira Reyes-Falcon, seek damages and attorney fees under 11 U.S.C. § 362(k) for the federal government's violation of section 362(a) by offsetting a postpetition tax refund against a prebankruptcy debt. The government does not

Page 1 – MEMORANDUM DECISION

dispute the stay violation. But it contends that the violation was not willful because it resulted from an erroneous computer program. I disagree, and I will enter judgment for debtors.

## II. Background

Debtors filed a joint chapter 13 case in 2018. In May 2019, they commenced this action against the U.S. Department of Education. The complaint alleges that the government seized $8,539.88 from their 2018 tax refund to collect a student-loan debt that predated the bankruptcy.[1] The complaint demands actual damages, including attorney fees and costs under 11 U.S.C. § 362(k).[2]

At trial, both debtors testified on their own behalf, and Michael Bryant, a business operations specialist for Education, testified for the government.

For the reasons I will explain below, I will grant judgment in favor of debtors.

## III. Facts

Debtors filed their chapter 13 petition on October 11, 2018.[3] Debtor Yadira Reyes-Falcon owed a debt to the government for a student loan that she received from the Department of Education. (The debt is scheduled as owed only by Chavez-Villasenor,[4] but both debtors testified without contradiction that the debt was only Reyes-Falcon's.[5]) The government received notice of the bankruptcy case.[6] The filing of the petition caused the automatic stay of section 362 to go into effect, prohibiting any action by the government to collect the debt.

---

[1] Docket item (DI) 1 (complaint) at 3.
[2] Complaint at 4.
[3] Main case DI 1.
[4] Main case DI 1 at PDF p. 29.
[5] *See, e.g.*, her testimony in the audio trial recording (hereinafter, Audio) at 34:00-35:00.
[6] Main case DI 9 (certificate of mailing of notice).

Page 2 – MEMORANDUM DECISION

Case 19-03046-dwh    Doc 24    Filed 04/09/20

When a person owing a debt to Education becomes entitled to a tax refund, the government's practice is to seize the refund and offset it against the taxpayer's debt to the government. The actual seizure and setoff apparently is done by the Treasury Department, but neither party has argued that Treasury and Education are separate for purposes of this action. When Education receives notice that one of its debtors is in bankruptcy, it must communicate that information to Treasury to prevent the seizure of tax refunds.[7] In practice, this means that Education's software transmits a list of debtors who have filed bankruptcy into the software used by Treasury, and the Treasury software then suspends the process of seizing those refunds.[8]

In the fall of 2018—around the time that debtors filed bankruptcy—the Education software experienced some sort of malfunction that prevented it from transmitting debtors' names to Treasury to suspend the seizure of their refund for 2018.[9] Because of difficulties and delays related to a software upgrade, Education did not discover until April 2019 that Reyes-Falcon's name had not been transmitted to Treasury to stop the setoff of her 2018 refund.[10] On April 30, 2019, an Education employee manually updated the software to correct the omission.[11] By then, it was apparently too late for Treasury to prevent the setoff.[12] The refund was seized and offset on May 1.[13]

On May 6, Education received from Treasury a file that revealed that the setoff had occurred on May 1.[14] An Education employee immediately began the process of reversing the

---

[7] Audio at 47:45.
[8] Audio at 47:45-48:00.
[9] Audio at 48:00.
[10] Audio at 48:00-49:00.
[11] Audio at 49:00; 50:00.
[12] Audio at 50:30-51:00.
[13] Audio at 50:30.
[14] Audio at 51:30.

setoff.[15] Unfortunately, no one at the government communicated to debtors that the error had been detected and that they would receive their expected refund after all.[16] Neither did debtors communicate with Education after they received a letter on May 1 informing them about the setoff.[17] Reyes-Falcon did speak to her contact at Education before she received the letter, because she had learned about the setoff independently.[18] She mentioned that she was in bankruptcy but didn't receive an explanation why the refund had been seized.[19] The refund—Treasury's reversal of the setoff, reinstating the original refund—"posted" on May 23, but debtors did not receive the money until the middle of June.[20]

Meanwhile, debtors had been expecting a tax refund since mid-April.[21] Chavez-Villasenor was angry when he read the May 1 letter. Because of an injury, he had been out of work and was behind on the rent,[22] and debtors were depending on the tax refund to pay both their bills and their monthly chapter 13 payments.[23] To his embarrassment, he resorted to borrowing money from his mother and his younger brother.[24] Unable to pay the rent, debtors had no choice but to move to a cheaper apartment, incurring a fee of "at least $2,900" for breaking their old lease, which they have not yet been able to pay.[25] They also were unable to pay their electricity bill or to catch up on other past-due bills.[26]

---

[15] Audio at 51:45-52:00.
[16] Audio at 52:30-52:45.
[17] Audio at 31:00-32:00; 41:00-41:30; 52:45.
[18] Audio at 43:00-44:00.
[19] Audio at 42:00-44:00.
[20] Audio at 53:00-53:45.
[21] Audio at 13:30-35.
[22] Audio at 13:40-50; 33:00-33:45.
[23] Audio at 13:55-14:00.
[24] Audio at 14:30-45.
[25] Audio at 15:00-16:00.
[26] Audio at 16:00-16:40.

Chavez-Villasenor was and still is deeply embarrassed and ashamed that he had to turn to his family members for cash.[27] He acknowledged that he was already under stress from the bankruptcy and his loss of work. But the financial dislocation caused by the withholding of the tax refund severely augmented his anxiety, causing him loss of sleep and nightmares.[28] It even jeopardized debtors' marriage, because he resented Reyes-Falcon for having incurred the student-loan debt that led to the situation. He stayed with his brother for three days to avoid fighting with his wife in front of his children.[29] Chavez-Villasenor was later wracked with guilt for having unfairly blamed his wife, when he knew from his own experience (having once been a debt collector himself) that the refund legally should not have been seized.[30]

Reyes-Falcon too was frustrated and guilt-ridden, and she dreaded having to tell her husband that the government had seized the couple's refund because of her debt.[31] She lost her phone service, because without the refund she was unable to pay her bill. Although money was already tight, she would have been able to pay the bill if she had received the refund. The loss of phone service prevented her from communicating with her family in Puerto Rico.[32]

Reyes-Falcon had pre-existing mental-health conditions, including bipolar disorder, but her guilt and frustration over the tax-return issue was, in her words, a "bomb" that aggravated her mental state and made her feel that she had ruined her family's life.[33] Even though her condition was already fragile as a result of other stressors, the seizure of the tax refund made it worse. She suffered frequent migraines for about three months, which she attributed at least in part to the

---

[27] Audio at 17:00-17:15.
[28] Audio at 21:30-22:00.
[29] Audio at 23:00.
[30] Audio at 17:15-18:45.
[31] Audio at 34:00-35:00; 36:45-37:00; 39:00-39:15.
[32] Audio at 35:30-36:00.
[33] Audio at 36:00-37:00.

Page 5 – MEMORANDUM DECISION

tax-refund problem.[34] She shares Chavez-Villasenor's continuing emotional agony over the strain that the situation has put on their marriage.[35]

Although debtors' finances were stretched thin even before the seizure of the tax refund, and they would soon have had to look to other sources of money to meet their obligations, I find from their testimony that they would not have had to break their lease had it not been for the seizure.[36]

## IV. Liability

This action presents an interesting question about the nature of the "willfulness" requirement of section 362(k). In 1989, the Ninth Circuit held in *Goichman v. Bloom (In re Bloom)* that a section 362(k) plaintiff need not prove that the defendant had "a specific intent to violate the stay."[37] Instead, the plaintiff need only prove that (1) "the defendant knew of the automatic stay" and (2) "the defendant's actions which violated the stay were intentional."[38] There is no question in this case that the government had notice of the stay, so the only issue on liability is whether it intended the act that violated the stay.

Debtors have cited a Ninth Circuit BAP decision, *In re Campion*, in which the panel emphatically rejected a creditor's attempt to blame its software for a supposedly inadvertent stay violation.[39] Some language in *Campion* suggests that there can be no such thing as a nonwillful violation by a creditor who has notice of the stay.[40] *Campion* also cites an earlier BAP decision,

---

[34] Audio at 38:00-39:00.
[35] Audio at 39:45-40:00.
[36] Audio at 29:00-29:15; 40:15-40:30.
[37] 875 F.2d 224, 227 (9th Cir. 1989), quoting INSLAW, Inc. v. United States (In re INSLAW, Inc.), 83 B.R. 89, 165 (Bankr. D.D.C. 1988).
[38] *Bloom*, 875 F.2d at 227.
[39] 294 B.R. 313, 317 (9th Cir. B.A.P. 2003).
[40] *Campion*, 294 B.R. at 317.

*In re Roberts*, for the proposition that "stay violations attributable to a computer are not "'inadvertent' . . . acts taken without knowledge of the existence of the stay.'"[41] Other cases could also be cited for the same proposition, including *In re Hill*.[42]

But the government reminds me that the Ninth Circuit's standard for liability requires an intentional act.[43] If it were true that every act committed after receiving notice of the stay is an "intentional act," then *Bloom*'s two elements—notice of the stay and an intentional violative act—would be redundant. Still, I can't ignore the apparent unanimity of the cases rejecting the "blame the software" defense.

These decisions can be reconciled by understanding the Ninth Circuit's meaning of "intended" in the second part of *Bloom*'s definition of "willful." An automatic-stay violation is a statutory tort, so the common law of torts can shed light on its elements. At common law, a person is said to act intentionally if the person either (1) subjectively desires to bring about a result or (2) acts with knowledge that the result is substantially certain to happen as a consequence of the action.[44]

To prove an intentional tort, it's not necessary for the plaintiff to prove that the defendant intended to break the law. So, for example, if I intentionally enter onto land that I believe is mine but actually belongs to my neighbor, I have committed the intentional tort of trespass.[45] My ignorance of the true ownership of the land is irrelevant; what matters is that I intended to enter onto it.[46] But if I enter onto my neighbor's land accidentally (for example, if I trip and fall across

---

[41] *Campion*, citing *Roberts*, 175 B.R. 339, 344 (9th Cir. B.A.P. 1994).
[42] 523 B.R. 704 (Bankr. D. Mont. 2014).
[43] DI 17 (Defendant's Trial Brief) at 3.
[44] Restatement (2d) of Torts § 8A.
[45] Restatement (2d) of Torts § 164.
[46] Restatement (2d) of Torts § 164 at cmt. c.

the boundary line), I have not committed a trespass, because I did not intend to enter onto the land.

If a creditor, having received notice of the stay, later forgets about it—or if an institutional creditor fails to communicate the notice to the employee responsible for collection—a subsequent intentional act to collect creates liability, even though the creditor acted without intent to violate the stay.[47] Only if the act of collection was itself unintentional is the creditor shielded from liability. For example, if a creditor after learning of the stay attempts to throw a stamped but unmailed billing statement into the recycle bin but instead accidentally drops it into the outgoing mail bin, a court would probably hold that there was no intentional act, thus no liability.

That the act of collection was carried out by a computer does not materially change the analysis. Again, the common law supplies an analogy. When a property owner sets a booby trap that will fire a spring-loaded gun when tripped, the owner is liable for an intentional tort when the trap later functions as expected and injures someone.[48] Likewise, when a creditor designs or installs collection software and the software later performs as expected, the creditor is held to have intended the result. Only if the software's collection activity is not part of its expected function—for example, if a computer virus causes it to send out billing statements at random—could the creditor properly argue that it did not intend the result.

The cases that reject the "blame the software" defense fit neatly into this interpretation of intent. In all three cases that I mentioned—*Campion*, *Roberts*, and *Hill*—there was no real dispute that the act that violated the stay was intentional. Instead, the creditors argued that their

---

[47] *Campion*, 294 B.R. at 317.
[48] *See, e.g.*, Katko v. Briney, 183 N.W. 2d 657 (Ia. 1971); Grant v. Hass, 31 Tex. Civ. App. 688, 75 S.W. 342 (1903).

Page 8 – MEMORANDUM DECISION

software had failed to keep track of the fact that the debtor was in bankruptcy. The courts rightly concluded that that kind of mistake does not negate intent.

With that understanding of intent, it's clear that the government intentionally seized debtors' tax refund. The government has not argued that Treasury's software was operating contrary to expectations when it withheld the refund. The software did precisely what it was designed to do: it withheld refunds to taxpayers whose names appeared on a list of those indebted to the government. The only malfunction was Education's failure to communicate with the Treasury software to stop it from seizing the refund. Whether the failure was caused by a glitch in the communication software or by human error is irrelevant.

Debtors have also argued that the government is liable even if it committed no act, because a creditor has an affirmative duty to discontinue collection activity once the stay goes into effect. It's true that some Ninth Circuit decisions have said that a creditor has an "affirmative duty" under section 362, at least where inaction would constitute either a continuation of prepetition litigation under subparagraph (a)(1) or an exercise of control over property of the estate under subparagraph (a)(3).[49] But I need not decide whether the "affirmative duty" extends any farther, because the government's setoff of the tax refund was not mere inaction—it was an intentional act to collect a debt.

The government therefore is liable for any damages caused by the seizure of the tax refund.

---

[49] Eskanos & Alder, P.C. v. Leetien, 309 F.3d 1210, 1215 (9th cri. 2002) ("maintenance of an active collection action alone adequately satisfies the statutory prohibition against 'continuation' of judicial actions"); *In re* Snowden, 769 F.3d 651, 659 (9th Cir. 2014) (creditor violated stay by retaining property).

**V.     Damages**

A defendant is liable for any injury that is actually and proximately caused by its tortious conduct. Some plaintiffs are more vulnerable than others, but defendants take their plaintiffs as they find them. This is the well-known "eggshell skull" rule; a plaintiff whose injuries are much worse than most people would suffer under the same circumstances is nevertheless entitled to full damages.[50]

These debtors had an eggshell checkbook. Because of pre-existing financial difficulties, the delay of the $8,500 tax refund was enough to push them over the edge and force them to break their lease. The $2,900 lease-break fee is therefore part of the damages proximately caused by the stay violation. So are the unusually severe emotional and psychological injuries that debtors suffered. They admitted that they were both under great stress before the stay violation. But the cascade of misfortunes that the violation set off greatly exacerbated their suffering. In this respect, I place especial importance on the testimony of both debtors about the mutual feelings of guilt, resentment, and self-reproach that placed their marriage in danger. Again, preexisting tensions no doubt made them more vulnerable to this injury, but the government must take its plaintiffs as it has found them. I also observe that debtors' injury was significantly worsened by the government's failure to communicate with them promptly to let them know that the situation was being resolved.

Debtors have asked for $10,000 in emotional-distress damages. I find that this request is a fair quantification of their emotional harm, and will grant it. I will also award $2,900 for the lease-break cost.

---

[50] *See, e.g.*, Richman v. Sheahan, 512 F.3d 876, 884 (7th Cir. 2008) (discussing eggshell doctrine).

Because section 362(k) makes attorney fees an element of damages, and the complaint includes a request for reasonable fees and costs, I will allow debtors' lawyer, Michael Fuller, 14 days in which to submit a statement of his fees before entering judgment. After he does so, the government will have 14 days in which to object. If necessary, I will hold a further hearing to rule on any objection. If the government does not object, I will enter judgment without delay.

# # #